was worn out by the ordinary wear and tear of the work.

Plaintiff has failed to make out its case. Judgment affirmed.

PROVOSTY, J., takes no part.

———

(71 South. 153)

No. 20367.

SAUNDERS v. BUSCH–EVERETT CO.

(Nov. 4, 1914. On the Merits, Feb. 21, 1916.)

*(Syllabus by Editorial Staff.)*

On Motion to Dismiss.

1. APPEAL AND ERROR &#9758;154(1)—GROUNDS FOR DISMISSAL — ACQUIESCENCE IN JUDGMENT.

That plaintiff pending his appeal from an adverse judgment in a suit to annul an oil and mineral lease sold to a third party an undivided one-half of the oils and minerals under a part of the land and conveyed same by an instrument specifying that the land was leased to defendant, and that the sale was made subject to such lease and included an undivided half interest in all royalties due under such lease, did not require the dismissal of the appeal on the ground that plaintiff had acquiesced therein, even though it be deemed an express admission of the validity of the lease and the correctness of the judgment appealed from; an admission of the correctness of a judgment, though good ground for affirming a judgment, constituting no ground for dismissing the appeal on the ground of acquiescence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 957, 958, 961, 962; Dec. Dig. &#9758;154(1).]

2. APPEAL AND ERROR &#9758;154(1)—GROUNDS FOR DISMISSAL—"ACQUIESCENCE"—"ADMISSION."

"Acquiescence," in a judgment such as will authorize dismissal of an appeal implies consent, and is not the same as an "admission" of the correctness of the judgment. A candid person admits a thing not because he wants to do so, but because truth compels him to do so, whereas it is the element of consent in acquiescence that furnishes the ground for dismissing an appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 957, 958, 961, 962; Dec. Dig. &#9758;154(1).

For other definitions, see Words and Phrases, First and Second Series, Acquiescence; Admission.]

3. APPEAL AND ERROR &#9758;154(1), 805—RATIFICATION OF JUDGMENT — ABANDONMENT OF APPEAL.

That plaintiff pending his appeal from an adverse judgment in a suit to annul a duly recorded oil and mineral lease stated in an instrument whereby he conveyed an interest in the oil and mineral to a third person, that the land was leased to defendant, and that the sale was made subject to the lease and covered an interest in royalties and rents due under it, did not amount to a ratification of the judgment by plaintiff and a consequential abandonment of his appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 957, 3174, 3175; Dec. Dig. &#9758;154(1), 805.]

4. ESTOPPEL &#9758;56—ADMISSION—INDUCEMENT TO ACTION.

Such alleged admission by plaintiff of the correctness of the judgment could not serve as a basis for estoppel where it was not acted on by defendant.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 142; Dec. Dig. &#9758;56.]

5. ESTOPPEL &#9758;25 — DEEDS — RIGHTS OF STRANGERS.

Strangers to a deed cannot avail themselves of an estoppel arising from it.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 61, 62; Dec. Dig. &#9758;25.]

6. APPEAL AND ERROR &#9758;780(2)—DISMISSAL—RIGHT—TRANSFER OF INTEREST.

That one to whom plaintiff had sold an interest in property and royalties pending his appeal from an adverse judgment in a suit to annul an oil and mineral lease, could, by setting up the sale, have prevented plaintiff from further prosecuting the suit, did not entitle defendant to a dismissal of the appeal because of the sale.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. &#9758;780(2).]

7. APPEAL AND ERROR &#9758;154(1)—RIGHT OF APPEAL—ABANDONMENT—ACQUIESCENCE IN JUDGMENT.

For an acquiescence in a judgment to take away the right of appeal, there must be an unconditional, voluntary, and absolute acquiescence by appellant, and he must have intended to acquiesce and abandon his right of appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 957, 958, 961, 962; Dec. Dig. &#9758;154(1).]

*(Syllabus by the Court.)*

On the Merits.

8. MINES AND MINERALS &#9758;58—OPTION TO DRILL FOR OIL AND GAS—"POTESTATIVE CONDITION."

A contract whereby the owner of land grants to another, in consideration of payments, made and to be made, of certain agreed sums of

money and other considerations which are to arise in a certain contingency, his right, or option, to drill for oil or gas within a year, and to extend the time thus granted, quarter by quarter, until it reaches a limit of 5 years, contains no potestative condition by reason of its failure to impose upon the grantee any obligation to drill, since it is not within the contemplation of the contract that he should drill, unless he so elects. The purpose is to confer the right to drill without imposing the obligation, and there is nothing in that purpose or in the nature of the contract which contravenes any law of this state.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 168, 169; Dec. Dig. ☞58.

For other definitions, see Words and Phrases, First Series, Potestative Condition.]

9. MINES AND MINERALS ☞58—OPTION TO DRILL FOR OIL AND GAS—CONSIDERATION—"SERIOUS CONSIDERATION."

Where, as a consideration for an option to drill for oil and gas upon lands in improved territory, the grantee pays, cash in advance, an amount equal to 3 per cent. on the market value of the lands for one year's time within which to exercise his option, and a like amount, in quarterly payments, in advance, during four years for quarterly extensions of the time, it cannot be said, either that the price (if the transaction be considered a sale) is not "serious" or that it is "out of all proportion to the value of the thing," within the meaning of Civ. Code, art. 2464. Whether it is adequate or inadequate is a question with which the courts have no concern, where neither error nor fraud are alleged and shown.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 168, 169; Dec. Dig. ☞ 58.]

Appeal from First Judicial District Court, Parish of Caddo; John R. Land, Judge.

Action by D. W. Saunders against the Busch-Everett Company. From judgment for defendant, plaintiff appeals, and defendant moves to dismiss. Motion to dismiss overruled, and judgment affirmed.

Scarborough & Carver, of Natchitoches, and Hall & Jack, of Shreveport, for appellant. Alexander & Wilkinson and Hampden Story, all of Shreveport, for appellee. Thigpen & Herold, of Shreveport, amici curiæ.

On Motion to Dismiss.

PROVOSTY, J. [1, 2] This being a suit to annul an oil and mineral lease made by the plaintiff to the defendant, the Busch-Everett Company, to a large tract of land, and plaintiff having appealed from an adverse judgment, motion is made to dismiss the appeal on the ground that plaintiff has acquiesced in the judgment. This acquiescence is sought to be deduced from the fact that subsequently to the rendition of the judgment plaintiff sold to a third party an undivided half of the oil and minerals in and under a part of said land by a notarial act duly recorded, containing the following clause:

"And, whereas, said land is now leased to the Busch-Everett Company, and by the Busch-Everett Company assigned to the Pasadena Petroleum Company, for development for oil and gas, as shown by lease recorded in the records of De Soto parish, this sale is made subject to said lease, and this sale covers and includes an undivided one-half interest in all royalties and rentals that may be due under the terms of said lease."

It is argued that by this clause plaintiff admitted the validity of the lease as to the part of the land embraced in the sale, and that, the lease being indivisible—not susceptible of being valid in part and invalid in part—the recognition of its validity as to a part of the land was a recognition of its validity as to the whole; and, ergo, was an admission of the correctness of the said judgment, and an acquiescence therein. That it was either this, or it was a fraudulent attempt on the part of plaintiff to defraud said third person by depriving him of "an undivided interest in all the royalties and rentals that may be due under said lease."

[3] This argument impresses us not at all. Even if plaintiff had made an express admission of the validity of the lease and of the correctness of the judgment appealed from, this would not have furnished ground for dismissal. While the admission of the correctness of a judgment may furnish the best of grounds for affirming the judgment on appeal, it furnishes no ground whatever

for dismissing the appeal on the ground of acquiescence; acquiescence implies consent; admission does not. A candid person admits a thing, not because he wants to do so, but because truth compels him to do so; whereas, it is the element of consent in acquiescence that furnishes the ground for dismissing an appeal. What we here say with regard to an admission not forming a basis for dismissal is illustrated by the fact that an admission furnishes no ground for estoppel until it has been acted on · to the prejudice of the person to whom it was made. 16 Cyc. 755. But, putting all this aside, as savoring, perhaps, more or less of refinement, what are the plain facts of the matter? The lease was duly recorded, and therefore any sale made by plaintiff of the oils and minerals embraced in it was necessarily subject to it. This condition of things was an existing, stubborn fact, which plaintiff did not have the power to change. The concealment, or attempted concealment, of it by plaintiff from his vendee would have constituted— what the defendant intimates the mention of it was—a fraud upon the said vendee. In common honesty it had to be mentioned. So that, all that plaintiff could do was to do exactly what he did do, namely, mention the fact of the existence of the lease and of the property passing subject to it, and, at the same time, convey all the rights he had under it. By this means the vendee was placed exactly in plaintiff's shoes with reference to the oils and minerals proposed to be sold; in other words, the object of the sale was fully accomplished.

To argue from this, that plaintiff intended to ratify the judgment from which he was appealing, and abandon his appeal, appears to us to be far-fetched in the extreme. Nothing shows that he intended anything of the kind. He had to either do as he did, or else ·not make the sale; and, unquestionably, he was at perfect liberty to make the sale. Per-

haps, for his own greater safety, he might have gone further and mentioned the fact of the pendency of the present suit; but his not having done so is a matter which in no way, shape, or form concerns the defendant.

[4-6] It is argued, further, that if this sale had been made prior to the institution of the present suit, it would "indubitably" have operated as an estoppel to it, and that therefore it is an acquiescence in the judgment.

We fail entirely to see the force of this reasoning. An admission not acted upon cannot serve as a basis for estoppel. Defendant has never acted on this so-called admission; so that, even if it had been made prior to this suit, the defendant could not have invoked it as a basis for estoppel. Moreover, nothing is more fundamental in the law of estoppel than that strangers to a deed cannot avail themselves of an estoppel arising from it. 16 Cyc. 710. True, if, in the present case, plaintiff's vendee should prefer that the lease should not be annulled, but should continue in existence, so that he might reap the advantages under it, he might set up this sale of all the plaintiff's right under the lease as an estoppel to the further prosecution by plaintiff of the present suit to annul said lease; but this is no business of the defendant. And, besides, we have little doubt that plaintiff's said vendee is as desirous to have said lease annulled as plaintiff himself is, and for the same reasons.

[7] In the said act of the plaintiff and appellant we fail to discover even the slightest evidence of acquiescence, whereas to take away the right of appeal there must be an unconditional, voluntary, and absolute acquiescence in the judgment on the part of the appellant, who must have intended to acquiesce and abandon his right of appeal. Sims v. Jeter, 129 La. 263, 55 South. 877, and authorities there cited.

The motion to dismiss is therefore overruled.

### On the Merits.

MONROE, C. J. Plaintiff seeks to annul two contracts, relating to oil and gas, made by him with defendant on March 10 and March 13, 1909, respectively; the one, concerning the rights to the oil and gas to be found beneath the surface of certain tracts of land aggregating 1,745 acres, and the other, concerning those minerals to be found beneath the surface of a tract of 100 acres, both of which contracts, he alleges, are void for want of mutuality, in that neither of them binds the defendant to bore any well or explore the land, and that both of them reserve to defendant the right to remove its fixtures, machinery, and improvements at its pleasure.

Another ground of attack, alleged in a supplemental petition, was, that the contracts had not been signed by defendant, but, as that ground is not here insisted upon, we need not consider it. The defense is, in effect, that plaintiff received, by cash paid in advance, an adequate consideration for the privilege accorded defendant of delaying the attempt to develop the land and cannot be heard to attack the contracts before the expiration of the periods covered by that privilege, and whilst still retaining the consideration, and, the less so, as defendant was engaged, when served with citation herein and before the expiration of such periods, in drilling a well.

The contracts contain provisions which are practically identical (and will be fully stated hereafter); the consideration, paid and to be paid, for the right to delay operation during the maximum term of 5 years, aggregating $267.72 per annum, or about 15 cents per acre; the whole amount due for the first year's delay having been paid upon the signing of the contracts, after which there were quarterly payments in advance, as will hereafter appear.

We find from the evidence that the territory (in the parish of De Soto) in which plaintiff's lands are situated was unproven and untried as an oil and gas field in 1909 (when the contracts were entered into), and so remained for about 2 years, when gas was discovered, and that the lands were worth barely $5 an acre. M. M. Nabors, a resident and landowner in that vicinity, gives the following testimony concerning the general situation, before, at the time of, and after the making of the contracts here in controversy, and his testimony is corroborated by that of other witnesses:

"Q. What kind of land is it? (referring to plaintiff's land). A. Average hill land, some creek bottom, good average land. Q. What is it worth for agricultural purposes? A. Well, you have a hard proposition; I don't know. Q. What was it worth for agricultural purposes in 1909 and 1910? A. Well, I guess $5 an acre would have been a good price; I do not know of any hill land selling for more than that. Q. In 1909 and 1910, what was paid and what were the usual prices for leases around there? A. About 10 cents an acre was the best price that I know of; when I was trying, before that, for coal, there was paid 10 cents an acre and (we) carried it until it broke the company. Q. Who raised the price? A. I think that the Busch-Everett was the first. Q. What did they pay? A. 15 cents, I was told. Q. In 1909 and 1910, there were no developments there? A. No, sir. Q. It was wild cat territory? A. Yes, sir. Q. When was the first well, gas or oil, produced, east of Mansfield? A. It was in April, 1911. Q. What was it? A. Gas well. Q. Who brought that in? A. The Christine Oil Company. Q. How far was that from the plaintiff's property? A. I do not know; I suppose Mr. Saunders' land—the nearest to that—was probably a mile and a half or two miles. Q. What was the first oil well produced there? A. The first oil well was the Jenjins A1—that proved good. Q. When was that? A. That was in 1913—in May. * * * Q. (by the Court.) Prior to the time, that any of those wells were drilled, what efforts did you make to get people to go in there and drill for oil? A. I tried for 11 or 12 years. * * * Q. And the first drilling done in that community was in 1911? A. Yes, sir."

It appears from the testimony of plaintiff that the gas well which was brought in in April, 1911, was quite near some of his land, and that later in the year he made a demand on defendant for the development of his land, and was told that they would

attend to it as soon as they could, but that nothing was done. In the meanwhile he continued to receive the quarterly payments in advance, amounting, under the two contracts, to $69.18—the last of such payments having been received by him for the quarters ending, respectively, on June 10 and 13, 1913. Thereafter, on May 10, 1913, the first paying oil well in that territory was brought in, about three-quarters of a mile from plaintiff's land, and, on May 17th, he instituted this suit, but service was not made on defendant until May 21st, and, prior to the service on the day that the suit was instituted, defendant had selected a site and begun operations for the drilling of a well by hauling material on the land for the building of a derrick, and on June 3d actually began drilling a well, which reached a depth of some 200 feet on June 29th, and produced gas, since which time, according to the brief of its counsel, other wells have been drilled and the work of development is being continued, though with what success is not shown, as other testimony concerning such operations, since the institution of the suit, was excluded.

There was judgment in the district court in favor of defendant, and plaintiff has appealed.

### Opinion.

[8, 9] The Civil Code contains the following among other provisions, to wit:

"Art. 1764. All things that are not forbidden by law, may legally become the subject of or the motive for contracts. * * *

"Art. 1885. All things, in the most extensive sense of the expression, corporeal or incorporeal, movable or immovable, to which rights can legally be acquired, may become the object of contracts. * * *

"Art. 2439. The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself. Three circumstances concur to the perfection of the contract, to wit: The thing sold, the price and the consent. * * *

"Art. 2449. Not only corporeal objects, such as movables and immovables, live stock and produce, may be sold, but also incorporeal things,

138 LA.—34

such as a debt, an inheritance, * * * a servitude or any other rights. * * *

"Art. 2451. It also happens * * * that an uncertain hope is sold; as the fisher sells the haul of his net before he throws it; and, although he should catch nothing, the sale still exists, because it was the hope that was sold, together with the right to have what might be caught. * * *"

"Art. 1901. Agreements legally entered into have the effect of laws on those who have formed them. They cannot be revoked, unless by mutual consent of the parties, or for causes acknowledged by law. They must be performed in good faith. * * *

"Art. 2464. The price of the sale must be certain, that is to say, fixed and determined by the parties. It ought to consist of a sum of money, otherwise it would be considered as an exchange. It ought to be serious, that is to say, there should have been a serious and true agreement that it should be paid. It ought not to be out of all proportion with the value of the thing; for instance the sale of a plantation for a dollar could not be considered as a fair sale; it would be considered as a donation disguised. * * *"

"Art. 2024. The potestative condition is that which makes the execution of the agreement depend on an event which it is in the power of the one or the other of the contracting parties to bring about or to hinder. * * *

"Art. 2034. Every obligation is null, that has been contracted, on a potestative condition, on the part of him who binds himself.

"Art. 2035. The last preceding article is submitted to potestative conditions, which make the obligation depend solely on the exercise of the obligor's will; but if the condition be, that the obligor shall do or not do a certain act, although the doing or not doing of the act depends on the will of the obligor, yet the obligation * * * is not void. * * *

"Art. 2679. Certain incorporeal things may also be let out, such as the right of toll, and the like; but there are some [things] which cannot be the object of hire, such as a credit."

Full liberty is therefore recognized as inherent in every person of legal capacity to enter into such contracts as are *not forbidden by law*, and, specifically, to contract with reference to *all things, in the most extensive sense of the expression, corporeal and incorporeal to which rights can legally attach;* to sell corporeal objects, incorporeal things, including a hope, together with the right to have what the buyer may hope to obtain in making the purchase; and to lease *certain incorporeal things, such as a right of toll, and the like.* And we have a specific declara-

tion of the lawmaker to the effect that, *if the condition of an obligation be that the obligor shall do, or not do, a certain act, although the doing, or not doing, of the act depends on the will of the obligor, yet the obligation is not void.* And there are still other provisions (of article 1764) which distinguish between those things which are of the essence of the contract and others which are implied, if no stipulation be made concerning them, but which may be waived or renounced without destroying the contract or changing its description; and between things which are of the essence and accidental stipulations which belong neither to the essence nor the nature of the contract, but depend solely on the will of the parties.

The contracts here sued on declare that:

"D. W. Saunders * * * in consideration of the sum of $261.75 [and $14.97, respectively], paid by the Busch-Everett Company, * * * and the further consideration hereinafter mentioned, has granted, bargained, sold, * * * unto said party of the second part, * * * all of the oil and gas in and under the following described land, together with the right of ingress and egress at all times for the purpose of drilling, mining, and operating for oil, gas, or water, and to conduct all operations; to erect storage tanks and other necessary structures and to lay all pipes necessary for the production, * * * mining and transportation of oil, gas, and water, with the right to use sufficient water, gas, or oil to operate said property, and shall have the right to remove all machinery, fixtures, and improvements placed thereon, at any time, reserving, however, to the party of the first part the equal one-eighth of all oil produced and saved upon said premises. * * * If gas is found, the party of the second part agrees to pay the party of the first part $200, * * * each year, payable quarterly, for the product of each well, while the same is being used off the premises, and party of the first part, by furnishing his own pipe and connections, shall have sufficient gas, free of cost, for use in one dwelling house on the premises, at his own risk. No well shall be drilled within 200 feet of any building now on said premises without the consent of the first party. Said land being of the following description: * * * To have and to hold the above-described premises to the said party of the second part, his heirs and assigns, on the following conditions: In case operations for either the drilling of a well for oil or gas is not commenced within one year from this date, then this grant shall immediately become null and void as to both parties; provided, that sec- ond party may prevent such forfeiture, from quarter to quarter, for 5 years, by paying to the first party the sum of $261.75 [and $14.97, respectively] per year, until such well is commenced; and it is agreed that the completion of a well shall operate as full liquidation of all rentals under this provision during the remainder of the term of this lease. * * * In case the party of the second part should bore and discover oil or gas, then, in that event, this grant, incumbrance, or conveyance shall be in force and effect for 25 years from the date of the discovery of said product and as much longer as oil or gas may be produced in paying quantities thereon. This grant is not intended as a mere franchise, but is intended as a conveyance of the property, for the purposes herein mentioned, and it is so understood by both parties to this agreement. If, at the time operations are begun under this lease, there are growing crops on the land, the said party of the second part agrees to pay all damages occasioned to such growing crops by such operations. It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors, administrators, and assigns."

It has been held by this court, after mature deliberation (and we find no reason for changing our opinion), that:

"Oil and gas while in the earth are not the subject of ownership distinct from the soil; and the grant of the oil and gas therefore is a grant, not of the oil or gas that is in ground, but of such part as the grantee may find, and passes nothing except the right to explore for the same under the terms of such contract." Rives et al. v. Gulf Refining Co. of La., 133 La. 178, 62 South. 623.

In the more recent case of Strother v. Mangham, 70 South. 426, ante, p. 437, No. 21436 of the docket of this court, it was said:

"The doctrine that the owner of the land has no property right in the oil or gas beneath the surface until he has reduced it to possession in no manner denies to such owner the exclusive right to the use of the surface for the purposes of such reduction, or for any other purpose not prohibited by law, but, to the contrary, concedes that right, as inherent in the title to the land, and subject only to the control of the state, in the exercise of its police power; and the right may be sold, as may be any other right, and may carry with it the right to the oil and gas that may be found and reduced to possession."

Let us assume that the contracts here in question are not sales within the meaning of C. C. 2451, nor, yet, leases of incorporeal

rights, within the meaning of C. C. 2679, they are, nevertheless, contracts, whereby, upon terms and for considerations which were agreeable to the parties thereto (who were both capable of contracting, and are not alleged to have been influenced by either fraud or error), the plaintiff conveyed to the defendant, for a price, in current money, paid and to be paid, and upon certain conditions, his (the plaintiff's) right to explore his land for oil and gas, at any time within 5 years, the right so conveyed to be exercised, or not exercised, at the option of the defendant.

We are not here necessarily concerned then with the question, whether the contracts thus entered into fall under one classification or another (though that question might arise in another case), but are inquiring whether they are forbidden by law, or were lawfully entered into; and if we find that they were lawfully entered into, we must hold that they "have the force of laws upon those who have formed them," and "cannot be revoked unless by the mutual consent of the parties, or for causes acknowledged by law," but "must be performed in good faith."

The Civil Code (article 1779) also declares that:

"Four requisites are necessary to the validity of a contract: (1) Parties legally capable of contracting. (2) Their consent legally given. (3) A certain object, which forms the matter of agreement. (4) A lawful purpose."

The capacity of the parties to the contracts here in question is not in dispute, and it will not be disputed that plaintiff had acquired, as inherent in his title, the right to explore his land for oil and gas, or that it was competent for him to make that right the object of a contract, and sell, or otherwise convey, it to defendant, or that a contract making such conveyance would have a lawful purpose. Nor do we think it can be effectually denied that by means of those contracts plaintiff did convey the rights thus mentioned to defendant; but, while there is no uncertainty concerning the thing conveyed, counsel for plaintiff, as it appears to us, have somewhat confused the purposes of the contracts, as disclosed by the terms in which they are framed with the purposes of the parties, respectively, in entering into them. As we read the contracts, the purposes of the parties were, upon the one hand, to convey to defendant plaintiff's right to explore his land for oil and gas, with the privilege of exercising it, or not, as defendant may choose, within a maximum delay of 5 years, conditioned upon defendant's making the payments as agreed on; and, in the event of the discovery of those minerals, or either of them, and their reduction to possession, to secure to defendant a certain property right in them; and, upon the other hand, to secure to plaintiff a certain price or consideration, payable in current money, and a certain other consideration, in the event of the discovery of oil and gas, in the shape of $200 per annum for the product of each gas well, while the gas is being used off the premises; the right to have sufficient gas, free of cost, for one dwelling house on the premises, so long as it is utilized off the premises, and an equal one-eighth of all oil produced and saved on the premises.

In other words, plaintiff, for a consideration, paid and to be paid in advance, and the promise of a further consideration in the event that defendant should elect to explore for, and should find, oil and gas, conveys to defendant his (plaintiff's) right to explore his land, at defendant's option, expense, and risk, within the maximum term of 5 years, and defendant, having paid the price of the option, exercised it by *not exploring* for several years, and was then engaged in exercising it *by exploring*, when it was cited to defend this suit.

We are unable to discover anything in the nature of the contracts which brings them within any prohibition of our law to which our attention has been called; and the same

thing may be said of the law of our sister states and of the United States.

Under our law, the owner of property may agree with another that he shall have the right to purchase the same at a fixed price, within a certain time. C. C. 2462; Smith v. Hussey, 119 La. 32, 43 South. 902; Legier v. Braughn, 123 La. 464, 49 South. 22; Lyons v. Woman's League, etc., 124 La. 222, 50 South. 18.

It is held, in other jurisdictions, concerning such a contract, that:

"It is, in legal effect, an offer to sell, coupled with an agreement to hold the offer open for acceptance for the time specified, such agreement being supported by a valuable consideration, or, at common law, being under seal, so that it constitutes a binding and irrevocable contract to sell if the other party shall elect to purchase within the time specified. * * * There may also be an option to sell. An option to sell land is as valid as an option to buy." 39 Cyc. pp. 1232, 1233.

    *    *    *    *    *    *

"When there is an agreement, founded on consideration, it is not invalid for want of mutuality because one party has an option while the other has not, or, in other words, because it is obligatory on one and optional with the other. * * * So want of mutuality cannot be set up as a defense by the party who has received the benefit, simply because it was left optional with the other party as to whether he would enforce his right. Such contracts, however, although good at law, are not favored by, and will not always be enforced in, a court of equity." 9 Cyc. 334.

And, by way of illustration of the last proposition, two cases from 8 Pa. Co. Ct. R. are cited, in one of which it was held that an agreement, whereby a baseball player bound himself to play for a club for a period of time, at the option of the club, which might equal the term of his life, and left the club at liberty to discharge him at will, would not be enforced; and in the other of which such an agreement, for 7 months, was sustained.

In all jurisdictions, the owner of land may convey to another his right to possess and use the land, and the contract is none the less valid that it leaves the lessee at liberty to cultivate or otherwise use the land, or leave it uncultivated or unused at his option.

If, then, the owner may bind himself to convey his property to another, with all of the elements of ownership, within a specified time, at the option of the other, or may convey to another his right to occupy the surface of the land, with the right to cultivate or improve it, at his option, he may also convey to another his right and option to explore beneath the surface of the land for oil, gas, or other minerals.

It is argued, on behalf of plaintiff (quoting from the brief of his counsel):

"That these leases are * * * void for want of mutuality and as containing a potestative condition, for the reason that the company does not *agree or obligate* itself to do anything at all, or to drill any well, or to make any effort to explore the land, but reserves the right to *remove all machinery, fixtures, and improvements* from the land, at any time, at its own will and pleasure."

And that argument is based upon expressions found in one or two of the opinions of this court concerning contracts which are assumed to be similar to, or identical with, those now under consideration; from which the inference is drawn that, in the view of this court, all such contracts, however remotely or contingently the exploration of land for oil or gas is contemplated, are to be construed as having such exploration for their immediate and main objects, no matter what may be the language in which the contracting parties have expressed themselves. We apprehend, however, that upon a careful consideration of the cases upon which the counsel rely, as well as of others which are supposed to have dealt with the issues here presented, it will be found that in each of them, by reason of differences in the contracts, the issues were not the same as here, and that upon the whole, the conclusions of the court were predicated upon its finding that there was no serious price, or price proportioned to value, as contemplated by C. C. 2464, mov-

ing to the owner of the land as a consideration for the rights conveyed to the other party.

In Murray v. Barnhart, 117 La. 1026, 42 South. 489, the owner leased his land, exclusively for oil and gas development, for 25 years, for the consideration of one dollar and the further consideration that the lessee should deliver to him one-tenth of all the oil produced and saved and pay him $100 per annum for each gas well, the product of which was used off the premises, to which was added the following:

"Second party covenants and agrees * * * to complete a well on said premises within one year, * * * or pay, at the rate of $4 quarterly, in advance, for each additional 3 months such completion is delayed. * * * It is agreed that the second party is to have the privilege, * * * at any time, to remove all machinery and fixtures placed on said premises, and, further, upon the payment of $2, at any time, * * * shall have the right to surrender the lease," etc.

From which it appears that, after acquiring, for $1, the lease of the property for 25 years, "for the sole and only purpose of mining and of operating for oil and gas," and after affirmatively binding himself "to complete a well on said premises in one year," or pay $4 a quarter, for each additional quarter's delay, the lessee was authorized to remove his machinery and cancel the lease, upon payment of $2, considering which various stipulations it was held that the main purpose of the contract was the development of the mineral-bearing properties of the land; that the lessee incurred no other obligation save for the initial payment of $1 and the $2 to be paid for the cancellation of the contract, and that they were not serious or valuable considerations, under our law. But the court did not hold that there is any law of this state which prohibits a contract whereby the owner of land, for a serious consideration, or a consideration not utterly disproportioned to value, as $1 would be to the value of a plantation, conveys to another the right to drill thereon for oil and gas, within a limited period, or refrain from drilling, at his option, with the privilege of extending such period upon conditions agreed on between him and the grantee. And of that character are the contracts here in controversy. They contain no provision whatever requiring defendant to drill a well, or to begin one. They merely confer upon it the right, in consideration of payments, made and to be made, of certain sums of money, to commence the drilling of a well within one year, and the further right to extend the time thus granted, quarter by quarter, until it reaches the limit of 5 years. There is therefore no potestative condition in the contract resulting from its failure to impose upon defendant the obligation to drill a well, since it was not within its contemplation that defendant should do so, unless he should so elect. What defendant contracted and paid for was the right to drill, without incurring the obligation to do so, just as one may contract for the right to buy land or any other property at a stipulated price, or, for the right to extend the lease of the house that he lives in, without, in the one case, incurring the obligation to buy, or, in the other, the obligation to renew the lease.

In Martel v. Jennings-Heywood, etc., 114 La. 351, 38 South. 253, it was found that, by one of the several contracts involved, the owner, for the consideration of $1, and a certain royalty, to be paid in the event of the discovery of oil or other minerals, conferred on the grantee the right to drill at any time within 99 years, but the grantee assumed no obligation to drill, and the court held, in effect, that it was a nudum pactum, as the grantee gave no consideration and bound itself to nothing.

In Gray v. Spring, 129 La. 360, 56 South. 305, Ann. Cas. 1913B, 372, the court ignored a recited payment by the grantee of $1, and held that he paid nothing and bound himself to nothing.

In Goodson v. Vivian Oil Co., 129 La. 958, 57 South. 281, there was a so-called lease for 10 years, with an option to drill within 6 months, for which the grantee paid $150, and drilled a well, which produced nothing but mud and water, and, the time having expired, the owner objected to the drilling of another well, and the objection was sustained, no consideration having been given for anything save the 6 months' option.

The opinion in Berl v. Kehoe, 130 La. 1020, 58 South. 864, contains the following:

"The '$1 in hand paid by the lessee' is no 'consideration,' and may be disregarded; * * * and there is nothing else in the contract which bears any resemblance to a consideration moving from the lessee in return for the right, granted to him by the lessors, to take possession of and exploit their land, and buy it at $50 an acre, in the event of the discovery of oil, save the stipulation, 'the lessee agrees to commence the drilling of a well within 6 months.' It will be observed that he imposes upon himself no obligation to prosecute the work * * * after it has begun or to complete it within any given period."

And the case was held to fall within the rulings in the cases above cited and others.

In Long v. Sun Co., 132 La. 601, 61 South. 684, the contract appears to have been similar to that which was before the court in the Murray-Barnhart Case. The grantee assumed the obligation to drill a well, from which the court as in the Murray-Barnhart Case, concluded that the development of the mineral products of the land was the main object of the contract, and that the initial payment of $1, and the quarterly payments of 10 cents an acre, with the privilege of canceling the contract at any time after the expiration of 12 months from its date, on payment of $1, was not a consideration proportioned to the value of the thing granted, and as, after the lapse of 3 years, there had been no well drilled, or begun, the contract was held to be void.

The case of Houssiere-Latreille, etc., v. Jennings-Heywood, etc., 115 La. 107, 38 South. 932, was a possessory action in which were involved certain questions of practice, as, also, the interpretation, on its face, of an oil contract. As to the latter, the view of the court is fairly stated in the last paragraph of the syllabus, on rehearing, which reads as follows:

"A contract purporting to be a lease for a term of 10 years of mineral rights in a 40-acre tract of land in an unproved part of the country, whereby the contractor agrees to commence operations within 6 months, or pay $50 quarterly, in advance, for each additional 3 months such operations are delayed, until an oil well is completed, and whereby he is given the right to remove his machinery at any time, and cancel the contract on payment of $100, and whereby in the event of the discovery of oil and gas, the gross yield is to be shared, in certain proportions, by the contracting parties, is not void upon its face for want of mutuality or as containing a potestative condition."

The case then went back to the district court and was fully tried upon its merits, and, upon the second appeal, on the rehearing, it was held by a majority of the members of this court as follows (quoting, in part, the syllabus on rehearing), to wit:

"That, since the sole object and purpose of the contract was to exploit the land for oil and gas, and the contract left the lessee at liberty to do so or not, at his option, there was, in reality, no contract binding on the lessee.

"That, if, however, there was a contract, it was either in the nature of an option to the lessee to begin operations within the time fixed in the contract, with the right to prolong the term by making quarterly payments, in advance, or else it was a commutative contract, wherein the obligation was to exploit the land for oil or gas. If it was the former, it came to an end by the lessee not exercising the option timely. If it was the latter, the lessee broke it by not beginning operations, nor offering to do so, within the term of the contract or within a reasonable time thereafter.

"That, even if the obligation of the lessee was alternative, namely, either to exploit the land for oil or gas, or else pay $50 in advance, quarterly, it became pure and simple when the alternative right to make the payments vanished from the contract as the result of failure to exercise that right in time; and, from that time, the only useful offer of performance the lessee could have made would have been to develop the land for oil or gas.

"An option must be exercised within the time limit, or the right will be lost." Jennings-Heywood, etc., v. Houssiere-Latreille, etc., 119 La. 864, 44 South. 510.

Plaintiff's counsel have argued, to some extent, that the consideration, agreed upon and paid by defendant, for the extension of the

delay within which the option to drill was to be exercised, was not serious, and was not proportioned to the value of the right granted, but we find nothing upon that subject in their petition. It is to be observed, in that connection, that C. C. 2464 deals exclusively with the question of the price, in a contract of sale, and we shall have to assume that the contracts under consideration are of that character in order to bring them within its application. Having so assumed, it will further be observed that the article makes no declaration concerning adequacy of price. It provides that the price should be certain, that it should consist of money, that it should be serious; that is to say, that it should not be a mere pretended price the payment of which is not contemplated; and, that, it should not be out of all proportion to the value of the thing. In this instance, the price, paid at the signing of the contracts, for the option for one year, was $276.72, after which there were 14 quarterly payments, of $69.18 each, up to, and inclusive of, the quarters ending June 10–13, 1913, all in strict accordance with the terms of the contract. The price (if the transaction be regarded as a sale) was therefore certain. It was paid in money. And, having been actually so paid, it cannot be said that it was not serious, within the meaning of the article to which we have referred. Nor do we think it can be said to have been out of all proportion to the value of the "thing" for which it was paid, according to the standard established by the illustration contained in that article. Plaintiff's lands, at the date of the contracts, were in a section of country in which no exploration for oil or gas had ever been made; they are said to have been worth about $5 an acre; and the amount paid, annually, by defendant was equal to about 3 per cent. upon that valuation, which, in all probability, was sufficient for the payment of the taxes.

There are, no doubt, thousands of landowners in Louisiana and elsewhere in this country who would be glad to enter into such contracts. Whether, however, the amount paid in this instance was adequate or inadequate is a matter with which we have no concern. It was certainly not disproportioned to the value of the thing acquired, as would be $1, in comparison to the value of a plantation, and, as plaintiff received in all 15 payments, extending over a period of about 4 years, it does not appear that he so considered it. We think it proper to add, in conclusion, that it is not the intention of this opinion to convey the idea that a landowner who has granted an option for the drilling of his land for oil or gas would be without remedy in a case in which it should be made to appear that, while the exercise of the option was being delayed, the land was being drained of those minerals. But that is not the case here presented, and, upon the other grounds set up, plaintiff is not entitled to the relief prayed for.

The judgment appealed from is accordingly affirmed.